115 T.C. No. 12

UNITED STATES TAX COURT

BLUE CROSS & BLUE SHIELD OF TEXAS, INC., AND SUBSIDIARIES,
Petitioner <u>v</u>. COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 361-98.                    Filed August 18, 2000.

<u>Held</u>:  "Savings" relating to "coordination of benefits" between health insurance companies do not qualify under the transition rule of the Omnibus Budget Reconciliation Act of 1990, Pub. L. 101-508, sec. 11305(c)(3), 104 Stat. 1388-452.  Claimed "special" deductions relating thereto are not allowed.

<u>Held</u>, <u>further</u>, the claimed "special" deductions also are not allowed under the safe harbor rule of sec. 1.832-4(f)(2), Income Tax Regs.

<u>Richard Bromley</u>, <u>Glen H. Kanwit</u>, <u>R. Lee Christie</u>, and <u>Tracy D. Williams</u>, for petitioner.

<u>John S. Repsis</u>, <u>Charles W. Maurer, Jr.</u>, <u>Stephanie R. Jensen</u>, and <u>Michael C. Prindible</u>, for respondent.

OPINION

SWIFT, Judge:  For 1992 and 1993, respectively, respondent determined deficiencies of $3,094,736 and $2,184,916 in petitioner's Federal income taxes.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

After settlement of some issues, the issue for decision is whether "savings" relating to "coordination of benefits" between petitioner and other health insurance companies qualify under the transition rule of the Omnibus Budget Reconciliation Act of 1990 (OBRA 1990), Pub. L. 101-508, section 11305(c)(3), 104 Stat. 1388-452.  If not, we must decide whether the claimed "special" deductions relating thereto are allowable under the safe harbor rule of section 1.832-4(f)(2), Income Tax Regs.

We combine our findings of fact and opinion.  Some of the facts have been stipulated and are so found.

During the years in issue, petitioner constituted an affiliated group of companies engaged in the business of providing medical health insurance to individuals and businesses. At the time the petition was filed, Blue Cross & Blue Shield of

Texas, Inc., the common parent of petitioner's affiliated group, maintained its principal place of business in Richardson, Texas. Hereinafter, petitioner will be referred to simply as Blue Cross.

Coordination of Benefits Provisions

Since the 1970's, medical health insurance plans written by Blue Cross and by other health insurance companies typically contain nearly identical "coordination of benefits" (COB) provisions that are based on COB guidelines published by the National Association of Insurance Commissioners and that are required by most State insurance laws. The COB provisions establish payment responsibility, as between two or more health insurance companies, where insurance claims are filed that are covered by more than one health insurance company. The COB provisions are intended to prevent duplicate recovery on claims with respect to the same medical expenses.

COB provisions are applicable where medical expenses are incurred by individuals who are covered under two or more health insurance plans. A common COB situation arises in a family context where both parents are employed, with one parent covered by one group health plan and the other parent covered by another group health plan, with the spouse of each parent and each child also covered by both of the parents' group health plans. In such

a situation, each member of the family has duplicate and overlapping health insurance coverage -- coverage under the father's plan and coverage under the mother's plan.

Under COB provisions, in such situations of duplicate and overlapping health insurance coverage, the various health insurance companies providing the overlapping insurance coverage are treated as either primarily or secondarily responsible for specific expenses and claims based on various and often arbitrary factors. For example, under COB provisions, medical expenses incurred by a husband would be treated as the primary responsibility of the medical insurance plan covering the husband directly as an employee. The insurance plan of the wife that covers the injured husband only as the spouse of the wife would be treated as secondarily responsible for the husband's expenses.

As a further example, if the two health insurance plans of the parents cover medical expenses of an injured child only because the child is a dependent of the parents, under typical COB provisions, the plan that covers the parent who has the earlier birthday in the calendar year is treated as having primary responsibility for the child's expenses.

Under COB provisions, health insurance companies that are treated as primarily responsible for medical expenses and claims (hereinafter referred to as primary insurers) are obligated to

pay claims submitted to them as they would in the absence of any secondary responsibility by another insurance company.

Health insurance companies that are treated as secondarily responsible for medical expenses and claims (hereinafter referred to as secondary insurers) generally are obligated to pay only that portion of claims representing the difference between the amount the primary insurers pay and the total amount of the claims. For example, if a child is injured and claims are filed under health insurance plans maintained by both parents, the primary insurer (i.e., the insurer issuing the plan of the parent with the earlier birthday during the calendar year) would be responsible for the total portion of the claim covered under its plan (e.g., 80 percent of the amount of the claim) and the secondary insurer would be responsible for the remaining 20 percent of the claim.

COB Savings

Each year, the difference between what health insurance companies would pay if they were the primary insurer on all claims covered by their medical insurance plans and what they under COB provisions, as secondary insurers, actually pay on claims are referred to in the health insurance industry as COB "savings". In the last illustration above, because the secondary insurer pays only 20 percent of the amount of the claim, 60 percent of the amount of the claim represents, to the

secondary insurer, COB savings (i.e., the additional amount the secondary insurer would have had to pay if it had been primarily responsible for the claim). Under the COB provisions, secondary insurers hypothetically "save" such amounts because they do not pay the additional portion of the claims that they would have paid if they had been the primary insurer.

Under COB provisions, once claims that have overlapping coverage have been filed and once primary and secondary responsibility as between two insurance companies for the claims has been identified, secondary insurers may wait for the primary insurers to calculate and to make their payments on pending claims before making the secondary payments (hereinafter referred to as the "wait-and-pay" approach). Alternatively, under COB provisions, secondary insurers may pay up front the full amount of the pending claims (up to the maximum coverage thereof) and then seek reimbursement from the primary insurers for amounts for which the primary insurers are responsible (hereinafter referred to as the "pay-and-pursue" approach).

Prior to and throughout the years in issue and unless paid in error, Blue Cross routinely used the wait-and-pay approach. Blue Cross only utilized the pay-and-pursue approach in the event a claimant did not disclose (or in the event Blue Cross's COB investigation department did not identify) duplicate health insurance coverage that would trigger coordination of benefits.

Medicare-Related COB Savings

Another common situation that produces amounts included by insurance companies in COB savings involves retired employees and their spouses who are over 65 years of age and who are covered under insurance plans issued by health insurance companies and who also are covered under Medicare.  Prior to and throughout the years in issue, language was included in Blue Cross' health insurance plans that excluded from coverage (and from liability) those medical expenses and claims that were covered "under the Workers' Compensation law, or any other present or future laws enacted by the Legislature of any state, or by the Congress of the United States [such as Medicare]."

Under typical COB provisions, the difference between what health insurance companies would be liable to pay for medical expenses in the event there was no Medicare coverage and the lesser amount the companies actually are liable for and pay after taking into account payments to be made by Medicare are referred to and represent "Medicare-related COB savings".

For 1989, Blue Cross calculated a total of $243,646,504 in total COB savings.  Approximately 85 percent of the $243,646,504 reflects Medicare-related COB savings, which, as indicated, were excluded from coverage under Blue Cross' health insurance plans.

Financial Reserves and Financial Statements

To assure eventual payment of expenses relating to injuries incurred during a year but with respect to which the related claims are not paid by yearend, health insurance companies are required by insurance regulators to maintain financial reserves relating to such estimated unpaid expenses (referred to as "losses") and to report such estimated unpaid losses on their financial statements.  Reserves for unpaid losses, then, reflect actuarially estimated amounts health insurance companies set aside for losses incurred during the year but with respect to which claims are not paid by yearend.

As of December 31 of each year, Blue Cross and other health insurance companies are required by insurance regulators and by generally accepted accounting practices, as applicable to insurance companies, to report the paid losses and the estimated unpaid losses incurred during the year on specialized annual financial statement forms (Annual Statements).

Paid losses reported on the Annual Statements reflect amounts of medical expenses that are incurred during the year that health insurance companies actually pay on claims.

Unpaid losses reported on the Annual Statements generally reflect actuarially estimated amounts of medical expenses that are incurred during the year but that by yearend are not yet paid by the health insurance companies.

With regard to the calculation each year of the estimated unpaid losses for which financial reserves are maintained, health insurance companies that use the pay-and-pursue approach for COB savings calculate their reserves for unpaid losses based on the full, total amount of coverage on their health insurance plans -- including amounts which, under the COB provisions, the reporting insurance companies will pay and thereafter be reimbursed by other insurance companies which are the primary insurers with regard to the claims.

Health insurance companies, however, such as Blue Cross, that use the wait-and-pay approach for COB savings, need only estimate their financial reserves for unpaid losses after taking into account and subtracting amounts which, under COB provisions, the reporting insurance companies will not have to pay because of the responsibility of other insurance companies as the primary insurers to pay such amounts.

Because actual funds must be maintained by health insurance companies in their financial reserves for amounts they calculate as incurred but unpaid losses, significant financial and economic differences exist for health insurance companies between insurance company calculations of loss reserves that do not subtract estimated COB savings and insurance company calculations of loss reserves that do subtract estimated COB savings.

Prior to and throughout the years in issue, for financial statement and Annual Statement reporting purposes, and in calculations of its financial loss reserves, Blue Cross subtracted COB savings in its calculations of its unpaid losses. Blue Cross therefore maintained financial reserves relating to unpaid losses only for its estimated primary and secondary payment responsibilities due on claims after primary insurers had made their primary payments.  In other words, Blue Cross did not maintain financial reserves with respect to its COB savings amounts.

Prior to and throughout the years in issue, Blue Cross also included language in its health insurance plans that entitled Blue Cross to recovery or subrogation of amounts Blue Cross had paid on claims (1) where the injury was caused by third-party tortfeasors or (2) where, under the COB provisions, the amounts should have been paid by other health insurance companies.  Such amounts received from tortfeasors and from other health insurance companies are treated and referred to by insurance companies as "subrogation recoverable".

The COB guidelines promulgated by the National Association of Insurance Commissioners treat COB savings differently from subrogation recoverable.  Blue Cross also treats COB savings differently from subrogation recoverable, and Blue Cross maintains separate departments for each.

1990 Change in the Tax Code

Generally, section 832(c)(4) allows health insurance companies a deduction from taxable income for losses incurred. For years prior to 1990, losses incurred were to be calculated by health insurance companies based on losses paid during the year, less "salvage" actually recovered during the year (i.e., less amounts recovered from third-party tortfeasors or others relating to claims they had paid), plus an adjustment for any increase or decrease in estimated incurred but unpaid losses. See sec. 832(b)(5)(A), I.R.C. (1986).

For years prior to 1990, in their calculations of incurred but unpaid losses, health insurance companies had the option of taking into account estimated recoveries from third-party tortfeasors and other health insurance companies. If health insurance companies elected to not reduce the calculations of their estimated incurred but unpaid losses by estimated recoveries, the health insurance company calculations were referred to as calculations of "unpaid losses gross of estimated recoveries". If health insurance companies elected to reduce the calculations of their estimated incurred but unpaid losses by estimated recoveries, the health insurance company calculations were referred to as "unpaid losses net of estimated recoveries".

In 1990, however, Congress amended section 832(b)(5)(A) for years beginning January 1, 1990, to require all health insurance companies, in calculating estimated incurred but unpaid losses

and the deductions relating thereto, to take into account estimates of salvage that might be recovered with respect to estimated incurred but unpaid losses (i.e., to make their calculations of unpaid losses net of estimated recoveries).  See OBRA 1990, sec. 11305(c), 104 Stat. 1388-451.

For health insurance companies that for years prior to 1990 had reported unpaid losses gross of estimated recoveries, the above change in section 832(b)(5)(A) would constitute a change in method of accounting and for 1990 would give rise to section 481 adjustments to income.  Congress, however, granted transitional relief and a one-time deduction to such companies by permanently forgiving 87 percent of the amount that under section 481 otherwise would have been includable in gross income for 1990, thereby reducing the section 481 adjustments that otherwise would have been required to just 13 percent thereof, to be taken into income ratably over 4 years beginning with 1990.  See OBRA 1990, sec. 11305(c)(2), 104 Stat. 1388-451.

To provide similar or parallel tax treatment for health insurance companies, such as Blue Cross, that prior to 1990 had reported unpaid losses net of estimated recoveries, Congress granted similar transitional or "special" deductions equaling 87 percent of the amount of "estimated salvage recoverable" that the companies had taken into account during 1989, to be deducted ratably over 4 years beginning with 1990.  The special deduction

rule of OBRA 1990, section 11305(c)(3), 104 Stat. 1388-452 (the special deduction rule), provided as follows:

> Treatment of companies which took into account salvage recoverable.--In the case of any insurance company which took into account salvage recoverable in determining losses incurred for its last taxable year beginning before January 1, 1990, 87 percent of the discounted amount of estimated salvage recoverable as of the close of such last taxable year shall be allowed as a deduction ratably over its 1st 4 taxable years beginning after December 31, 1989.

For 1990 through 1993, Blue Cross timely filed consolidated U.S. Corporation income tax returns. Blue Cross calculated that under the special deduction rule a total of $70,950,582 reflected Blue Cross' estimated salvage recoverable relating to incurred but unpaid losses for its last taxable year beginning before January 1, 1990. Accordingly, Blue Cross multiplied the total $70,950,582 by 87 percent and by a discount factor of approximately 4 percent, to produce a figure of $59,352,862, and Blue Cross deducted one fourth of the $59,352,862, or $14,838,215, for each of the years 1990 through 1993 as its special deduction.

On audit for years 1992 and 1993, respondent disallowed each of Blue Cross' claimed $14,838,215 special deductions.[1]

---

[1] The evidence does not indicate respondent's treatment of the special deductions claimed by Blue Cross on its 1990 and 1991 Federal corporation income tax returns.

Approximately 94 percent of the total $70,950,582 claimed by Blue Cross as estimated salvage recoverable reflected COB savings. Further, as previously indicated, approximately 85 percent of the COB savings amount reflected Medicare-related COB savings.

Only approximately 3 percent of the $70,950,582 claimed by Blue Cross as estimated salvage recoverable reflected amounts that Blue Cross actually paid and then recovered from tortfeasors and from other insurance companies.[2]

The relevant statutory provisions do not define what is meant by "estimated salvage recoverable". E.g., OBRA 1990, sec. 11305(c), 104 Stat. 1388-451. It is therefore necessary to look beyond the statutory language to the limited regulatory and case authority on point.

Section 1.832-4(c), Income Tax Regs., provides that estimated salvage recoverable includes --

---

[2] Approximately 1 percent of the $70,950,582 Blue Cross calculated as total estimated salvage recoverable reflected amounts for which it was both primary and secondary insurer, or "blue on blue". The parties recognize that with respect to blue-on-blue duplicate coverage, Blue Cross could not recover salvage from itself. Another approximate 2 percent reflected amounts for which Blue Cross did not assume the health insurance risks of employees and dependents, but provided employers with administrative services only. Blue Cross concedes that this 2 percent clearly does not represent genuine salvage recoverable.

all anticipated recoveries on account of salvage, whether or not the salvage is treated, or may be treated, as an asset for state statutory accounting purposes.  * * * [And] includes anticipated recoveries on account of subrogation claims arising with respect to paid or unpaid losses.

Case law relevant to the meaning of estimated salvage recoverable is limited.  The Supreme Court in a century-old case explained salvage rights as follows:  "[T]he insurer, when he has paid * * * the assured * * * is entitled, by way of salvage, to the benefit of anything that may be received".  Phoenix Ins. Co. v. Erie & W. Transp. Co., 117 U.S. 312, 321 (1886), cited in Continental Ins. Co. v. United States, 200 Ct. Cl. 552, 474 F.2d 661 (1973).  (Emphasis added.)

Black's Law Dictionary 1280, 1340 (7th ed. 1999) defines "recovery" as "the regaining or restoration of something lost or taken away", and it defines "salvage" (utilized largely in the property and casualty insurance industry) as "property saved or remaining after a fire or other loss, sometimes retained by an insurance company that has compensated the owner for the loss." (Emphasis added.)

In essence, Blue Cross contends that, because under its health insurance plans it is contractually liable for the full potential amount of all claims covered by its insurance plans, it should be regarded as having a contractual right of recovery or salvage for all portions of claims with respect to which other insurance companies and Medicare also have a liability to pay the

claims or portions thereof.  Blue Cross argues that, as injuries occur and as medical expenses relating thereto are incurred by insured individuals, Blue Cross accrues the right to recover from other insurance companies and Medicare that also have insured the same individuals.  In sum, Blue Cross argues that the insured individuals' right to recover from other insurance companies and Medicare is subrogated to Blue Cross where Blue Cross also has issued insurance plans covering the same individuals.

Blue Cross argues that there is no significant economic difference between "taking immediate possession" from the insured individuals of the intangible rights of recovery and salvage with respect to COB savings (as it does under a pay-and-pursue approach) and "leaving" with the insured individuals the rights of recovery and salvage with respect to COB savings (as it does under a wait-and-pay approach).  Blue Cross argues that under either approach, for Federal income tax purposes, it should be treated as economically realizing the recovery and salvage rights with respect to COB savings.  Accordingly, Blue Cross contends that its COB savings relating to incurred but unpaid losses before January 1, 1990, reflect salvage recoverable and should be included in the calculations of estimated salvage recoverable under the special deduction rule.

Medicare-Related COB Savings

Respondent contends that because Medicare-related benefits are excluded from coverage under Blue Cross' health insurance plans, Blue Cross' Medicare-related COB savings give rise to no liability on the part of Blue Cross. Respondent therefore concludes that the portion of claims covered by Medicare gives rise to no right of recovery or salvage in favor of Blue Cross and that the portion of Blue Cross' claimed salvage recoverable that is based on and that relates to Medicare-related COB savings should not, under the special deduction rule, be treated as salvage recoverable and the claimed loss deductions relating thereto should not be allowable. We agree with respondent.

The language contained in Blue Cross' medical insurance plans clearly indicates that Blue Cross is not liable to pay amounts covered by Medicare. Without contractual liability and without payment of Medicare-covered benefits, Blue Cross' Medicare-related COB savings do not constitute estimated salvage recoverable.

Non-Medicare-Related COB Savings

Because Blue Cross utilized the wait-and-pay approach with respect to its non-Medicare-related COB savings, respondent contends that such non-Medicare-related COB savings likewise do not constitute estimated salvage recoverable under the special deduction rule. Respondent argues that Blue Cross never expected

to pay COB savings amounts (i.e., amounts that primary insurers were responsible for and pay) and that Blue Cross never acquired fixed and genuine rights of recovery and salvage with regard thereto.  We again agree with respondent.

The applicable regulation under section 832 requires that unpaid losses, to be taken into account in computing losses incurred, are to represent a fair and reasonable estimate of the amount health insurance companies actually will be required to pay, not of what they theoretically might have to pay.  Section 1.832-4(b), Income Tax Regs., in relevant part provides:

> Every insurance company to which this section applies must be prepared to establish to the satisfaction of the district director that the part of the deduction for "losses incurred" which represents unpaid losses at the close of the taxable year comprises only actual unpaid losses. * * * These losses must be stated in amounts which, based upon the facts in each case and the company's experience with similar cases, represent a fair and reasonable estimate of the amount the company will be required to pay. * * *

The evidence shows that in the years before 1990, Blue Cross consistently used the wait-and-pay approach and did not pay (unless in error), reserve for, or expect to make payments with respect to its COB savings.

Blue Cross argues that because it could, after 1989, elect to use the pay-and-pursue approach or that primary insurers could fail to make their payments (e.g., in the event a primary insurer becomes insolvent), Blue Cross' COB savings, without the benefit

of hindsight, theoretically could reflect salvage recoverable taken into account as of December 31, 1989.

As previously indicated, for the years in issue and in subsequent years, Blue Cross generally did not make payments for which other companies under the COB provisions were primarily responsible. We conclude that (because Blue Cross used the wait-and-pay approach before making secondary payments) Blue Cross' COB savings do not qualify as estimated salvage recoverable and are not allowable as a deduction under the special deduction rule.

To qualify as estimated salvage recoverable for purposes of the special deduction rule there must exist an expectation of actual payment. The mere fact that a loss has been incurred on the date of an injury does not mean that health insurance companies expect to be responsible for and expect to pay the full amount of claims relating to the injury.

With respect, however, to the 3 percent of the $70,950,582 that Blue Cross calculated as its total estimated salvage recoverable reflecting amounts Blue Cross actually paid and then recovered from third-party tortfeasors and other health insurance companies, such amounts do represent genuine subrogation recoverable and do qualify as estimated salvage recoverable under the special deduction rule.

Safe Harbor Relief

Blue Cross also contends that its estimate of salvage recoverable and related deductions under the special deduction rule qualify for safe harbor relief. Under section 1.832-4(f)(2), Income Tax Regs., it is provided that, if the requirements for safe harbor are satisfied, respondent may be precluded from making an adjustment to the amounts of "bona fide" estimated salvage recoverable reported and claimed by health insurance companies.

Health insurance companies seeking to qualify under the safe harbor provision, among other things, were required to file with State insurance regulators by September 16, 1991, a statement that identifies the extent to which the companies' incurred losses for each line of business, as reported on their 1989 Annual Statements, were reduced by bona fide estimated salvage recoverable. The pertinent language of section 1.832-4(f)(2)(i), Income Tax Regs., provides as follows:

> (2) Safe Harbor. The requirements of paragraph (f)(1) of this section are deemed satisfied and the amount that the company reports as bona fide estimated salvage recoverable is not subject to adjustment by the district director, if--
>
> (i) The company files with the insurance regulatory authority of the company's state of domicile, on or before September 16, 1991, a statement disclosing the extent to which losses incurred for each line of business reported on its 1989 annual statement were reduced by estimated salvage recoverable.

On or before September 16, 1991, Blue Cross filed a letter with the Texas Department of Insurance, the entire contents of which are set forth below:

As you are aware, in reporting to your department [BLUE CROSS] has always followed actuarially accepted and certified practices for determining and reporting its losses incurred and its incurred unpaid claim reserves. In OBRA 1990, Congress granted a special one time deduction to insurance carriers who report losses incurred as we do. IRS regulations provide that a notification filed with your office will establish the amount of this allowable tax deduction.

The sole purpose of this letter is to notify you that we have determined our special tax deduction to be 87% of $74,780,518 discounted at 96.1538% for recoveries related to our losses incurred deduction prior to 1990 and reported in the 1989 Annual Statement.

OUR REPORTING TO YOU HAS NOT CHANGED AND WILL NOT CHANGE IN ANY RESPECT FROM THE ACCEPTED METHODS AND APPROACHES WE HAVE ALWAYS USED. Our incurred unpaid claim reserves will continue to be determined using the same methods, include the same actuarial certifications as always and continue to be in full compliance with established methods and practices approved and routinely examined by your department. [Emphasis in original.]

As respondent notes, the language of the above letter does not begin to disclose to Texas insurance regulators the extent to which Blue Cross' losses that were incurred for each line of business, as reported on its 1989 Annual Statement, were reduced by estimated salvage recoverable. No separate lines of business are disclosed, and the words "estimated salvage recoverable" are

not even used in the letter.  We conclude that Blue Cross did not satisfy the disclosure requirement for safe harbor relief under section 1.832-4(f)(2), Income Tax Regs.

Further, as previously held, Blue Cross' calculation of its estimated salvage recoverable (consisting predominantly of COB savings) does not reflect "bona fide" or genuine salvage recoverable, and therefore Blue Cross' disclosure of that calculation would not satisfy the disclosure required for safe harbor relief under section 1.832-4(f)(2), Income Tax Regs.

To reflect the foregoing,

Decision will be entered

under Rule 155.